IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RANDY K. A.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:21-cv-412-DWD |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423. For the following reasons, the final agency decision is due to be affirmed.

## Procedural History

Plaintiff applied for DIB in August 2015, alleging a disability onset date of July 17, 2013. After holding an evidentiary hearing, an Administrative Law Judge ("ALJ") denied the application on February 20, 2018. The Appeals Council remanded the case to a second ALJ, who held a hearing and then denied Plaintiff's application for DIB on May 11, 2020. The Appeals Council denied Plaintiff's request for review on February 18, 2021, making the second ALJ's decision the final agency decision subject to judicial review. Plaintiff

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

exhausted administrative remedies and filed a timely complaint with the Court seeking judicial review of the Commissioner's decision. (Doc. 1).

## **Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The

findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Accordingly, the Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the Court takes the entire administrative record into consideration but does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; the Court does not act as a rubber stamp for the Commissioner. See *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. At step one, he determined that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date. At step two, the ALJ found that Plaintiff has the following severe impairments: degenerative disc disease, osteoarthritis of the right knee, obesity, and obstructive sleep apnea. (Tr. 17). The ALJ also found that Plaintiff has the following nonsevere impairments: adjustment disorder, polysubstance abuse disorder, and right shoulder impingement. (Tr. 17).

3

At step three, the ALJ found that Plaintiff does not have any impairments or combination of impairments that meet any of the listings. The ALJ concluded that Plaintiff has no limitation in his ability to understand, remember, and apply information or in his ability to concentrate, persist, and maintain pace. (Tr. 17–18). But the ALJ did find that Plaintiff has a mild limitation in his ability to interact with others and in his ability to adapt or manage himself. (Tr. 17–18).

Before proceeding to step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform medium work with the following limitations:

> the claimant can frequently climb ramps or stairs and never climb ladders, ropes, or scaffolds. He can frequently balance, stoop, kneel, crouch, and crawl. The claimant should avoid concentrated exposure to work hazards such as unprotected heights.

(Tr. 19).

At step four, the ALJ relied on the testimony of a vocational expert ("VE") to find that Plaintiff could not perform his past relevant work as a railroad track repairer. (Tr. 24). But the ALJ found that Plaintiff could perform other jobs that existed in significant numbers in the national economy. (Tr. 25). Accordingly, at step five, the ALJ found that Plaintiff was not disabled. (Tr. 28).

## The Evidentiary Record

Plaintiff was 58 years old at the time of the ALJ's decision. He lives with his parents and is their caretaker. (Tr. 1065). At the time of the hearing, Plaintiff had been in a relationship with his girlfriend for two years. (Tr. 46–47). Plaintiff completed high school. (Tr. 405). He was a farmer for 10 years before working as a railroad repairer until 2011.

(Tr. 405).

Plaintiff was treated by Guatam Jha, M.D., from June 6, 2012, to September 25, 2015. (Tr. 694–707). According to Dr. Jha's records, Plaintiff complained of back pain. Dr. Jha's records indicate mostly normal findings on physical exam. (Tr. 694–707). Dr. Jha ordered an x-ray of Plaintiff's lumbar spine which was performed on April 2, 2015, and indicated lumbar spondylosis. (Tr. 664–65, 713). Dr. Jha prescribed Plaintiff several pain medications throughout those years, including Vicodin, acetylsalicylic acid ("ASA"), gabapentin, and tramadol.

In 2015 and 2016, Plaintiff was treated by several other providers for back pain, knee pain, and tingling in his legs and feet. (Tr. 671, 719, 795, 799–801, 889, 915, 917, 1043). Physical exams revealed a limp, decreased strength of the lower extremities and left hip, tenderness and decreased range of motion of the back, crepitus of the knees, and both positive and negative straight leg raise tests. (Tr. 796, 798, 800, 921, 1051–52). And diagnostic imaging indicated focally advanced chondromalacia, patellofemoral arthrosis, osteochondral injury, and some subchondral edema in the left knee. (Tr. 913, 946, 947).

But in December 2015, Plaintiff reported to a physician that he was an avid hunter and walked long distances with difficulty. (Tr. 719). An imaging report in March 2016 indicated that Plaintiff had no acute fracture or dislocation but had mild to moderate spondylosis in his lumbar spine. (Tr. 884). An x-ray performed at the same time showed no acute fracture, dislocation, or bone lesions in either of his knees. (Tr. 885). In an April 2016 MRI imaging report, Plaintiff was found to have mild encroachment on bilateral LR-L5 and left L5-S2, slight degenerative changes of the neural foramina, but no significant

compromise of the neural structures, a slight right foraminal peripheral annular tear, but no abnormality explaining the left-sided sciatica. (Tr. 887). A December 2016 MRI on Plaintiff's left knee indicated a focally advanced chondromalacia, minimal joint effusion, and minimal superior patellar enthesopathy at the quadriceps tendon attachment. (Tr. 913).

In 2016, Dr. Jha referred Plaintiff to Paul Juergens, M.D., a pain management specialist. In July 2016, Dr. Juergens' physical exam had largely normal findings and a negative straight leg raise test but did indicate a slight decrease in flexion and tenderness at one spinal level. (Tr. 921). In August 2016, Dr. Juergens' physical exam had no unusual findings. (Tr. 918). Dr. Juergens treated Plaintiff by providing a series of nerve block injections. (Tr. 918). Dr. Juergens denied Plaintiff's request for a hydrocodone refill but did provide prescriptions for tramadol and gabapentin. (Tr. 919, 921). Plaintiff reported minimal pain following the injections. (Tr. 916).

In November 2017, Plaintiff received an MRI of the lumbar spine, which indicated mild facet arthrosis at L5-S1, subtle lateral bulge of disc material, subtle midline bulge, and mild central canal and mild bilateral foraminal encroachment, but no disc herniation. (Tr. 942). The reading physician concluded overall that Plaintiff had a mild concentric disc bulge but was otherwise normal. (Tr. 942). On the same day, Plaintiff received an MRI of his right knee, which indicated patellofemoral arthrosis and a small osteochondral injury. (Tr. 946). The MRI showed that the collateral and cruciate ligaments were intact and that there was no meniscal tear. (Tr. 946).

Most recently, in December 2019, Plaintiff was treated at a hospital for pain in his

right shoulder resulting from an injury he suffered when breaking up a fight. (Tr. 963). He reported that the injury had taken place about two weeks earlier and that he had been taking tramadol and Vicodin for the pain but without relief. (Tr. 963). His review of systems and physical exam had no abnormal findings except for pain and tenderness in his right shoulder. (Tr. 964–65).

## Analysis

Plaintiff makes two arguments in favor of remand. First, he argues that the ALJ failed to give appropriate weight to the opinions of Dr. Jha, a treating physician. Second, Plaintiff argues that the ALJ failed to explain why he did not incorporate his mental impairment findings into the RFC. The Court addresses these arguments in turn.

### A.   Treating Physician's Opinion

In a letter written on February 26, 2020, Dr. Jha opined that Plaintiff is limited to light work due to degenerative joint disease, severe back pain, knee pain, and depression. (Tr. 1053). He defined light work as "sitting for up to 2 hours/day, standing & walking for 6 hours a day but no more, lifting & carrying for . . . 1/3 of [a] full workday & 10 pounds for up to 2/3 of a full workday." (Tr. 1053). The ALJ afforded this opinion very little weight for several reasons. (Tr. 23). First, he observed that Dr. Jha's definition of "light work" is inconsistent with the definition used in the regulations. But more importantly, the ALJ found that Dr. Jha did not provide any objective evidence to support the limitations and that he has not treated Plaintiff since 2016 or 2017. (Tr. 23). Finally, the ALJ found that the limitations are inconsistent with the diagnostic examinations throughout the record, the findings from Dr. Jha's own physical exams of Plaintiff, and

Plaintiff's lack of treatment for his back and knees over the three years before the hearing. (Tr. 23).

Plaintiff argues that the ALJ erred by not giving controlling weight to the opinions expressed by Dr. Jha in his February 2020 letter. The opinion of a treating physician is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2). If the ALJ does not give a medical opinion controlling weight, the ALJ will assess the weight of the opinion based on several factors: (1) whether the opinion comes from a source that examined or treated Plaintiff; (2) the extent to which the source supports the opinion with evidence and explanation; (3) the consistency of the opinion with the rest of the record; (4) whether the source is a specialist; and (5) any other relevant factors. 20 C.F.R. § 404.1527(c).

Plaintiff argues that Dr. Jha's opinion is supported by several facts. First, Dr. Jha started treating Plaintiff at least as early as June 6, 2012. (Tr. 707). From 2012 to 2015, Dr. Jha treated Plaintiff for back and knee pain by prescribing several pain medications, including Vicodin, ASA, gabapentin, and tramadol. Dr. Jha also ordered an x-ray in April 2015 that revealed lumbar spondylosis. (Tr. 664–65). Second, Plaintiff argues that the record as a whole is consistent with Dr. Jha's opinion. Plaintiff points to the fact that he had been treated by several providers for back pain, knee pain, and tingling in legs and feet. (Tr. 671, 719, 795, 799–801, 889, 915, 917, 1043). Physical exams revealed a limp, decreased strength of the lower extremities and left hip, tenderness and decreased range of motion of the back, crepitus of the knees, and both positive and negative straight leg

8

raise tests. (Tr. 796, 798, 800, 921, 1051–52). And diagnostic imaging indicated focally advanced chondromalacia, patellofemoral arthrosis, osteochondral injury, and some subchondral edema in the left knee. (Tr. 913, 946, 947).

The ALJ acknowledged that Dr. Jha was Plaintiff's treating physician. But the ALJ observed that most of Plaintiff's physical exams with Dr. Jha were normal, notwithstanding Dr. Jha's pain medication prescriptions. (Tr. 694–701). In December 2015, Plaintiff reported to a physician that he was an avid hunter and walked long distances with difficulty. (Tr. 719). The ALJ acknowledged that one of Dr. Jha's physical exams in March 2016 revealed back pain, a positive straight leg raise test, and enlargement and crepitus in his knees (Tr. 800) but concluded that Dr. Jha's own medical records did not adequately support his opinion regarding Plaintiff's limitations.

Similarly, the ALJ found that the medical record as a whole failed to support Dr. Jha's opinion. An imaging report in March 2016 indicated that Plaintiff had no acute fracture or dislocation but had mild to moderate spondylosis in his lumbar spine. (Tr. 884). An x-ray performed at the same time showed no acute fracture, dislocation, or bone lesions in either of his knees. (Tr. 885). In an April 2016 MRI imaging report, Plaintiff was found to have mild encroachment on bilateral L4-L5 and left L5-S2, slight degenerative changes of the neural foramina, but no significant compromise of the neural structures, a slight right foraminal peripheral annular tear, but no abnormality explaining the left-sided sciatica. (Tr. 887). A December 2016 MRI on Plaintiff's left knee indicated a focally advanced chondromalacia, minimal joint effusion, and minimal superior patellar enthesopathy at the quadriceps tendon attachment. (Tr. 913).

In July 2016, Dr. Juergens' physical exam had largely normal findings and a negative straight leg raise test but did indicate a slight decrease in flexion and tenderness at one spinal level. (Tr. 921). In August 2016, Dr. Juergens' physical exam had no unusual findings. (Tr. 918). Dr. Juergens treated Plaintiff by providing a series of nerve block injections. (Tr. 918). Dr. Juergens denied Plaintiff's request for a hydrocodone refill but did provide prescriptions for tramadol and gabapentin. (Tr. 919, 921). Plaintiff reported minimal pain following the injections. (Tr. 916).

Two state-agency physicians reviewed the record in November 2015 and February 2016 and found that Plaintiff could perform a full range of medium work. (Tr. 168, 188). The ALJ also observed that the record does not show that Plaintiff had any medical treatment after his injections in 2016 and two MRIs in November 2017. Even when Plaintiff went to the emergency room in November 2019 with shoulder pain after breaking up a fight, his physical exam was negative for back or knee issues. (Tr. 964–65). Thus, there is substantial evidence supporting the ALJ's conclusion that Dr. Jha's opinion is inconsistent with the bulk of the medical record.

Plaintiff argues that even if Dr. Jha's opinion was not entitled to controlling weight, the ALJ still should have given it deference. However, the factors used to weigh the value of a physician's opinion do not support Plaintiff's argument. As discussed above, there is substantial evidence supporting the ALJ's finding that Dr. Jha's opinion is inconsistent with the medical record. Further, the ALJ relied on the fact that despite Dr. Jha's years-long treating relationship with Plaintiff, there is no evidence that Dr. Jha had seen Plaintiff during the three years leading up to his February 2020 letter. (Tr. 23).

Finally, the ALJ noted that Dr. Jha offered little evidence or reasoning to support his conclusions regarding Plaintiff's ability to work. (Tr. 23). In fact, the records showing Dr. Jha's pain medication prescriptions also showed routinely normal physical exam findings. (Tr. 20).

Finally, Plaintiff argues that the ALJ erred because he rejected Dr. Jha's opinion in part because Dr. Jha defined "light work" incorrectly. But in fact, as Plaintiff points out, Dr. Jha's limitations are largely consistent with the definition of "light work." Under the regulations, "light work" is defined as

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b). The limitations described by Dr. Jha in his February 2020 letter are largely identical to this definition. Accordingly, the ALJ erred in rejecting Dr. Jha's opinion in part because he believed Dr. Jha's definition of "light work" differed from that of the regulations. However, administrative error may be harmless and not require remand. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). An ALJ's error is harmless if the court is "convinced that the ALJ will reach the same result" on remand. *Id.* Here, the Court has found that substantial evidence supports the ALJ's rejection of Dr. Jha's medical opinion regarding Plaintiff's limitations, regardless of how those limitations were labelled or categorized. Despite the ALJ's error, the ALJ primarily rejected Dr. Jha's opinion because it was inconsistent with the medical record. The Court is convinced that the ALJ would reach the same conclusion on remand and that his error was therefore

11

harmless. For these reasons, the Court finds that there is substantial evidence supporting the ALJ's decision to afford little weight to Dr. Jha's medical opinion.

**B.     Mental Impairments**

Plaintiff also argues that the ALJ erred by failing to incorporate Plaintiff's mental limitations into the RFC. At Step 2, the ALJ found that Plaintiff had mild limitations in his ability to interact with others and in his ability to adapt and manage himself. (Tr. 17–18). As to the first ability, the ALJ noted that Plaintiff reported having anger control issues but that he had been dating his girlfriend for two years, cares for and lives with his parents, attends church, drives family and friends to run errands daily, and was cooperative with normal speech and eye contact. (Tr. 46–47, 1065, 1069). As to the second ability, the ALJ noted that Plaintiff reported smoking marijuana and taking narcotic pain medication that was not prescribed to him and that he was diagnosed with cannabis and opioid use disorders and dependence. (Tr. 1065, 1078).

The ALJ made clear that his evaluation of Plaintiff's mental limitations in that portion of the opinion was made only for purposes of assessing the severity of mental impairments at steps 2 and 3 of the sequential evaluation process, not for purposes of an RFC assessment. (Tr. 18). As the ALJ noted, "the mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment." (Tr. 18). The ALJ's approach is entirely consistent with the Social Security Administration's guidance. *See* SSR 96-8p ("[T]he limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.

The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment . . . ."). Later in his opinion, the ALJ did provide a more detailed mental functioning assessment. The ALJ gave great weight to Dr. Jha's opinion that Plaintiff has no significant mental limitations, which is supported by Dr. Jha's psychiatric exams throughout the record and Plaintiff's overall lack of mental health treatment. (Tr. 786–90). Accordingly, the Court finds that the ALJ adequately explained his reasons for not including any mental health limitations in the RFC. *Cf. Palomo v. Colvin*, No. 1:13-cv-1544-TWP-MJD, 2015 WL 926208, at *13 (S.D. Ind. Mar. 3, 2015) (finding ALJ did not err by not incorporating mild mental limitations into RFC because ALJ elsewhere provided a detailed assessment of the plaintiff's mental functioning).

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ's findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of Defendant.

**SO ORDERED.**

Dated: July 29, 2022

DAVID W. DUGAN
United States District Judge